UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------ X

STUART FORCE individually and as personal
representative of the ESTATE OF TAYLOR FORCE,
60 Autumn Oaks Drive, The Hills, Texas 78738;

ROBBI FORCE,                                          Case no. 20-cv-3027
60 Autumn Oaks Drive, The Hills, Texas 78738

KRISTIN ANN FORCE,
4616 Shoal Creek Blvd., Unit B, Austin, Texas 78756

RINA ARIEL individually, as personal representative of
the ESTATE OF H.Y.A. (a minor), and as guardian of
S.R.A. and K.A. (minors),
1526 Harchasina, Kiryat Arba, Israel;

AMICHAI ARIEL individually, as personal
representative of the ESTATE OF H.Y.A. (a minor), and
as the guardian of S.R.A. and K.A. (minors)
1526 Harchasina, Kiryat Arba, Israel;

ELI M. BOROCHOV,
433 Arbuckle Avenue, Cedarhurst, New York 11518;

SHARI MAYER BOROCHOV,
433 Arbuckle Avenue, Cedarhurst, New York 11518;

RONEN STEVEN BOROCHOV,
433 Arbuckle Avenue, Cedarhurst, New York 11518;

DEVORA SUE BOROCHOV,
433 Arbuckle Avenue, Cedarhurst, New York 11518;

JOSEF S. BOROCHOV,
433 Arbuckle Avenue, Cedarhurst, New York 11518;

SHIRA NECHAMA BOROCHOV,
433 Arbuckle Avenue, Cedarhurst, New York 11518;

AVRAHAM M. BOROCHOV,
433 Arbuckle Avenue, Cedarhurst, New York 11518;

ABRAHAM RON FRAENKEL, individually, as
personal representative of the ESTATE OF Y.N.F.
(minor), and as guardian of A.L.F., N.E.F., N.S.F., and
S.R.F. (minors),
68 Moriah, Nof Ayalon, Israel;

RACHEL DEVORA SPRECHER FRAENKEL,
individually, as personal representative of the ESTATE
OF Y.N.F. (minor), and as guardian of A.L.F., N.E.F.,
N.S.F., and S.R.F. (minors),
68 Moriah, Nof Ayalon, Israel;

TZVI AMITAY FRAENKEL,
68 Moriah, Nof Ayalon, Israel;

AYALA CHAYA HINDA FRAENKEL,
68 Moriah, Nof Ayalon, Israel;

MOSHE FULD,
50 Hanachal, Karnei Shomron, Israel;

MICHAL FULD,
187 Ben Yehuda Street, Tel Aviv, Israel;

ELI FULD,
26 Hatirosh Street, Hasmonaim, Israel;

BEN ZION FULD,
9 Walter Avles Street, Jerusalem, Israel;

YEHUDAH GLICK, individually and as guardian of
S.G. (minor), and as the executor of the Estate of Yaffa
Glick,
202 Henrietta Szold Street, Jerusalem, 9658493, Israel;

NERIA DAVID GLICK,
48 Iceland Street, Jerusalem 9658493, Israel;

SHLOMO GLICK,
48 Iceland Street, Jerusalem 9658493, Israel;

HALLEL GLICK,
48 Iceland Street, Jerusalem 9658493, Israel;

MICAH LAKIN AVNI, individually, as personal
representative of the ESTATE OF RICHARD LAKIN,
and as guardian of Y.L, R.A., and V.A. (minors),
c/o Peninsula Financial, 48 Yehuda HaLevi Street, Tel
Aviv 6578202, Israel;

MANYA LAKIN, individually, as personal
representative of the ESTATE OF RICHARD LAKIN,
and as guardian of D.A.B. (minor),
c/o Peninsula Financial, 48 Yehuda HaLevi Street, Tel
Aviv 6578202, Israel;

RITA AVNI, individually and as guardian of E.A., R.A.,
and V.A. (minors),
c/o Peninsula Financial, 48 Yehuda HaLevi Street, Tel
Aviv 6578202, Israel;

SHACHAR BOTEACH,
c/o Peninsula Financial, 48 Yehuda HaLevi Street, Tel
Aviv 6578202, Israel;

SHMUEL ELIMELECH BRAUN individually and as
personal representative of the ESTATE OF C.Z.B.

-3-

(minor),
9 Sorotzkin Street, Jerusalem, 9442317, Israel;

CHANA BRAUN individually and as personal
representative of the ESTATE OF C.Z.B. (minor),
9 Sorotzkin Street, Jerusalem, 9442317, Israel;

SHIMSON SAM HALPERIN,
20 Wallenberg Circle, Monsey, New York 10952;

SARA HALPERIN,
20 Wallenberg Circle, Monsey, New York 10952;

MURRAY BRAUN,
128 North McCadden Place, Los Angeles, California
90004;

ESTHER BRAUN,
128 North McCadden Place, Los Angeles, California
90004;

MENACHEM MENDEL RIVKIN, individually and as
guardian of S.S.R., M.M.R., R.M.R., S.Z.R., and S.R.
(minors),
6 Savyon Street, Apt. 2, Givat Zeev 90917, Israel;

BRACHA RIVKIN, individually and as guardian of
S.S.R., M.M.R., R.M.R., S.Z.R., and S.R. (minors),
6 Savyon Street, Apt. 2, Givat Zeev 90917, Israel;

YOAV GOLAN,
Tel Hai 22, Kefar Saba, Israel;

ROTEM SHOSHANA GOLAN,
Tel Hai 22, Kefar Saba, Israel;

YEHUDIT GOLAN,
Zarhi 56/11, Jerusalem, Israel;

MATAN GOLAN,
Zarhi 56/11, Jerusalem, Israel;

CICI JACOBSON,
Shimoni 8, Rehovot, Israel;

EDDY JACOBSON,
Shimoni 8, Rehovot, Israel;

RAPHAEL ("RAFI") LISKER, individually and as
guardian of D.Z.L. (minor),
79 Hamelech David Blvd. Apt. 2, Efrat, 9045123, Israel;

SHOSHANA LISKER, individually and as guardian of
D.Z.L (minor),
79 Hamelech David Blvd. Apt. 2, Efrat, 9045123, Israel;

JONATHAN ISSAC LISKER,
79 Hamelech David Blvd. Apt. 2, Efrat, 9045123, Israel;

AVITAL KEREM LISKER,
79 Hamelech David Blvd. Apt. 2, Efrat, 9045123, Israel;

TAMAR PENINA LISKER,
79 Hamelech David Blvd. Apt. 2, Efrat, 9045123, Israel;

NOAM MICHAEL SHAMBA, individually and as
guardian of H.S., T.M.S., O.S., M.S., N.E.S. and N.S.
(minors),
13 Shmaryahu Levin 13, Jerusalem, 9666417, Israel;

and

YANA SHAMBA, individually and as guardian of H.S.,
T.M.S., O.S., M.S., N.E.S. and N.S. (minors),
13 Shmaryahu Levin 13, Jerusalem, 9666417, Israel;

Plaintiffs,

-5-

-against-

REPUBLIC OF SUDAN
Ministry of Foreign Affairs
Jalan Subok
Bandar Seri Begawan BD 2710
Brunei Darussalam, Sudan

Defendant.

-------------------------------------------------------------------- X

## **FIRST AMENDED COMPLAINT**

Plaintiffs, by their counsel, complain of the Defendant, and hereby allege for their Complaint as follows:

## **INTRODUCTION**

1.     This is a civil action for wrongful death, personal injury and related torts pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*., brought by United States citizens who were victims of terrorist acts carried out by the Hamas and Palestinian Islamic Jihad ("PIJ") terrorist organization with the aid and support of the Republic of Sudan.

## **JURISDICTION AND VENUE**

2.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330-1332, 1367, 1605 note, and 1605A(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4) and the rules of pendent venue.

## THE PARTIES

3.     Plaintiff Stuart Force at all times relevant hereto, is and was a U.S. citizen domiciled in South Carolina and the father, heir and personal representative of the estate of decedent Taylor Force, who was murdered by a Hamas operative on March 8, 2016. At all times relevant hereto, decedent Taylor Force was a U.S. citizen.  Plaintiff Stuart Force brings this action individually and on behalf of the Estate of Taylor Force.

4.     Plaintiff Robbi Force at all times relevant hereto, is and was and was a U.S. citizen domiciled in South Carolina and the mother of decedent Taylor Force.

5.     Plaintiff Kristin Ann Force at all times relevant hereto, is and was and was U.S. citizen and the sister of decedent Taylor Force.

6.     Plaintiff Rina Ariel at all times relevant hereto is and was a U.S. citizen domiciled in Israel and the mother, heir and personal representative of the estate of decedent H.Y.A (a minor). H.Y.A. was murdered in her sleep by a Hamas terrorist on June 30, 2016. At the time of her death, H.Y.A. was a U.S. citizen domiciled in Israel. Plaintiff Rina Ariel brings this action individually, as personal representative of the Estate of H.Y.A., and as natural guardian of S.R.A., minor and K.A., minor.

7.     Plaintiff Amichai Ariel at all times relevant hereto, is and was an Israeli citizen domiciled in Israel and the father, heir and personal representative of the Estate of H.Y.A. Plaintiff Amichai Ariel brings this action individually, as personal representative of the Estate of H.Y.A., and as natural guardian of S.R.A., a minor, and K.A., a minor.

8.     Minors S.R.A. and K.A., at all times relevant hereto, are and were U.S. citizens domiciled in Israel, and the sisters of decedent H.Y.A.

-7-

9.     Plaintiff Eli M. Borochov at all times relevant hereto is and was a United States citizen domiciled in the U.S. On November 6, 2015, Eli was shot by a Hamas terrorist.

10.    Plaintiff Shari Mayer Borochov at all times relevant hereto is and was a United States citizen domiciled in the U.S., and married Eli on August 20, 2019.

11.    Plaintiff Ronen Steven Borochov at all times relevant hereto is and was a U.S. and Israeli citizen domiciled in the U.S., and the father of Eli.

12.    Plaintiff Devora Sue Borochov at all times relevant hereto is and was a U.S. citizen domiciled in the U.S., and the mother of Eli.

13.    Plaintiff Josef S. Borochov at all times relevant hereto is and was a U.S. citizen domiciled in the U.S., and the brother of Eli.

14.    Plaintiff Shira Nechama Borochov at all times relevant hereto is and was a U.S. citizen domiciled in the U.S., and the sister of Eli.

15.    Plaintiff Avraham M. Borochov at all times relevant hereto is and was a U.S. citizen domiciled in the U.S., and the brother of Eli.

16.    Plaintiffs Abraham Ron Fraenkel and Rachel Devora Sprecher Fraenkel at all times relevant hereto are and were the parents, heirs and personal representatives of the estate of their minor son, Y.N.F., who was a citizen of the United States at the time of his kidnapping and murder by Hamas terrorists. Plaintiffs Abraham Ron Fraenkel and Rachel Devora Sprecher Fraenkel are also the parents of minor plaintiffs A.L.F., N.E.F., N.S.F., and S.R.F.

17.    Plaintiff Rachel Devora Sprecher Fraenkel at all times relevant hereto is and was a citizen of the United States domiciled in Israel.

18.     Plaintiffs Abraham Ron Fraenkel and Rachel Devora Sprecher Fraenkel each bring this action individually, as joint administrators of the Estate of Y.N.F., and as the natural and legal guardians on behalf of their minor children, A.L.F., N.E.F., N.S.F., and S.R.F.

19.     Plaintiff Abraham Ron Fraenkel at all times relevant hereto is and was a citizen of Israel.

20.     Plaintiff Tzvi Amitay Fraenkel at all times relevant hereto is and was a United States citizen domiciled in Israel, and the brother of decedent Y.N.F.

21.     Plaintiff Tzvi Amitay Fraenkel at all times relevant hereto is and was a United States citizen domiciled in Israel, and the brother of decedent Y.N.F.

22.     Ayala Chaya Hinda Fraenkel at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Y.N.F.

23.     Minor A.L.F. at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Y.N.F.

24.     Minor N.E.F. at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Y.N.F.

25.     Minor N.S.F. at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Y.N.F.

26.     Minor S.R.F. at all times relevant hereto is and was a United States citizen domiciled in Israel, and the brother of decedent Y.N.F.

27.     Plaintiff Yehudah Glick was a U.S. citizen domiciled in Israel on October 29, 2014 when he was severely wounded in a PIJ terrorist attack. He has since been elected to the Israeli Knesset and was compelled by Israeli law to renounce his U.S. citizenship. Plaintiff Yehuda Glick is the father of Plaintiffs Neria David Glick, Shlomo Glick, Hallel Glick and S.G. (a minor).

Plaintiff Yehuda Glick brings this action individually and as natural guardian of his minor child S.G.

28.     Yaffa Glick, who at all times relevant hereto, was a U.S. citizen, was the wife of Plaintiff Yehuda Glick and the mother of Plaintiffs Neria David Glick, Shlomo Glick, Hallel Glick and S.G. (a minor). She has passed away, and plaintiff Yehuda Glick is the executor of her estate, and brings this action on behalf of her estate.

29.     Plaintiffs Neria David Glick, Shlomo Glick, and Hallel Glick, at all times relevant hereto, are and were U.S. citizens domiciled in Israel and the children of Plaintiff Yehuda Glick.

30.     Minor S.G., at all times relevant hereto, is and was the child of Plaintiff Yehuda Glick, and was and is a U.S. citizen domiciled in Israel.

31.     Plaintiff Micah Lakin Avni, at all times relevant hereto, is and was a U.S. citizen domiciled in Israel and the son, heir and personal representative of the estate of decedent Richard Lakin, who was murdered by Hamas operatives on October 13, 2015. Plaintiff Micah Avni brings this action individually, as personal representative of the Estate of Richard Lakin, and as parent and natural guardian of Y.L, R.A., and V.A., minors who are the grandchildren of decedent Richard Lakin. At all times relevant hereto, decedent Richard Lakin was a U.S. citizen.

32.     Plaintiff Manya Lakin, at all times relevant hereto, is and was a U.S. citizen domiciled in Israel and the daughter, heir and personal representative of the Estate of Richard Lakin. Plaintiff Manya Lakin brings this action individually, as personal representative of the Estate of Richard Lakin, and as parent and natural guardian of D.A.B, a minor and grandson of decedent Richard Lakin.

33.     Plaintiff Rita Avni is the wife of plaintiff Micah Lakin Avni and the daughter-in-law of decedent Richard Lakin, and brings this action individually and as parent and natural

guardian of E.A., R.A., and V.A., minors. R.A. and V.A are the grandchildren of decedent Richard Lakin and E.A. is the step-granddaughter of decedent Richard Lakin. At all times relevant hereto, Plaintiff Rita Avni is and was an Israeli citizen domiciled in Israel.

34.    The minor D.A.B., at all times relevant hereto, is and was a U.S. citizen domiciled in Israel.

35.    The minor Y.L., at all times relevant hereto, is and was a U.S. citizen domiciled in Israel.

36.    The minors R.A. and V.A., at all times relevant hereto, are and were Israeli citizens.

37.    The minor E.A., at all times relevant hereto, is and was an Israeli citizen domiciled in Israel.

38.    Plaintiff Shachar Boteach is the daughter of Plaintiff Manya Lakin, and granddaughter of decedent Richard Lakin. At all times relevant hereto, Plaintiff Shachar Boteach is and was a U.S. citizen domiciled in Israel.

39.    Plaintiffs Shmuel Elimelech Braun and Chana Braun at all times relevant hereto are and were the parents, heirs and personal representatives of the estate of their minor daughter, C.Z.B., who was also a citizen of the United States on October 22, 2014 when she was killed by a Hamas terrorist. Plaintiffs Shmuel Elimelech Braun and Chana Braun, at all times relevant hereto, are and were citizens of the United States domiciled in Israel. They each bring claims individually, and as joint administrators of the Estate of C.Z.B.

40.    Plaintiffs Shimson Sam Halperin, Sara Halperin, Murray Braun, and Esther Braun at all times relevant hereto are and were citizens of the United States domiciled in Israel, and the grandparents of decedent C.Z.B.

41.     Plaintiff Menachem Mendel Rivkin at all times relevant hereto is and was a citizen of the United States domiciled in Israel. Plaintiff Menachem Mendel Rivkin was stabbed by a Hamas terrorist on January 27, 2016. He brings claims individually, and as the natural and legal guardian of his minor children, S.S.R., M.M.R., R.M.R., S.Z.R., and S.R., who are also citizens of the United States.

42.     Plaintiff Bracha Rivkin at all times relevant hereto is and was the wife of plaintiff Menachem Mendel Rivkin, and a citizen of the United States domiciled in Israel. Plaintiff Bracha Rivkin brings claims individually, and as the natural and legal guardian of her minor children, S.S.R., M.M.R., R.M.R., S.Z.R., and S.R.

43.     Plaintiffs Yoav Golan and Rotem Shoshana Golan, at all times relevant hereto are and were U.S. citizens domiciled in Israel. On December 14, 2016, Plaintiffs Yoav Golan and Rotem Shoshana Golan were injured when a Hamas terrorist deliberately drove a car into a crowd of people waiting at a bus station.

44.     Plaintiff Yehudit Golan at all times relevant hereto is and was a U.S. citizen domiciled in Israel, and is the mother of Yoav.

45.     Plaintiff Matan Golan at all times relevant hereto is and was a U.S. citizen domiciled in Israel, and is the brother of Yoav.

46.     Plaintiff Cici Jacobson at all times relevant hereto is and was a U.S. citizen domiciled in Israel and is the grandmother of Yoav.

47.     Plaintiff Eddy Jacobson at all times relevant hereto is and was a U.S. citizen domiciled in Israel, and is the grandfather of Yoav.

48.     Plaintiff Raphael ("Rafi") Lisker at all times relevant hereto is and was a U.S. citizen domiciled in Israel, and brings this action individually and as the natural guardian of D.Z.L.,

minor. On December 23, 2106, Plaintiff Rafi Lisker was stabbed in the neck by a Hamas terrorist while walking home from Sabbath services with his wife Shoshana.

49.     Minor D.Z.L. at all times relevant hereto is and was a U.S. citizen domiciled in Israel, and the child of Plaintiff Rafi Lisker.

50.     Plaintiff Shoshana Lisker is the wife of Plaintiff Rafi Lisker, and at all times relevant hereto is and was a U.S. citizen domiciled in Israel. Shoshana Lisker brings this action individually and as the natural guardian of D.Z.L., minor.

51.     Plaintiff Jonathan Issac Lisker is the son of Plaintiff Rafi Lisker, and at all times relevant hereto is and was a U.S. citizen domiciled in Israel.

52.     Plaintiff Avital Kerem Lisker is the daughter of Plaintiff Rafi Lisker, and at all times relevant hereto is and was a U.S. citizen domiciled in Israel.

53.     Plaintiff Tamar Penina Lisker is the daughter of Plaintiff Rafi Lisker, and at all times relevant hereto is and was a U.S. citizen domiciled in Israel.

54.     Plaintiff Noam Michael Shamba, at all times relevant hereto, is and was a U.S. citizen domiciled in Israel. On December 14, 2015, Plaintiff Noam Shamba was a victim of a terrorist attack perpetrated by a Hamas operative. Plaintiff Noam Shamba brings this action individually and as parent and natural guardian of his minor children H.S., T.M.S., O.S., M.S., N.E.S. and N.S., all of whom are and were at all times relevant hereto U.S. citizens domiciled in Israel.

55.     Plaintiff Yana Shamba, at all times relevant hereto, is and was a U.S. citizen domiciled in Israel. Plaintiff Yana Shamba is the wife of Plaintiff Noah Shamba. She brings this action individually and as parent and natural guardian of her minor children H.S., T.M.S., O.S., M.S., N.E.S. and N.S.

56.     Ari Fuld was murdered on September 16, 2018 by a terror attack committed by Hamas. At the time of the acts alleged, and at all other times relevant hereto, Ari Fuld was a citizen of the United States and at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A.

57.     Plaintiff Moshe Fuld was, and at all times relevant hereto, the brother of Ari Fuld, and a citizen of the United States.

58.     Plaintiff Michal Fuld was, and at all times relevant hereto, the neice of Ari Fuld, and a citizen of the United States.

59.     Plaintiff Eli Fuld was, and at all times relevant hereto, the nephew of Ari Fuld, and a citizen of the United States.

60.     Plaintiff Ben Zion Fuld was, and at all times relevant hereto, the nephew of Ari Fuld, and a citizen of the United States.

61.     Defendant The Republic of Sudan ("Sudan"), is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Sudan, through its political subdivisions, agencies, instrumentalities, officials, employees and agents, provided Hamas and PIJ with material support and resources, for acts of extrajudicial killing within the meaning of 28 U.S.C. § l 605A(a)(l ), including the terrorist attacks at issue herein, and performed other actions that enabled, facilitated and caused the terrorist attacks at issue herein and harm to the plaintiffs herein.

## UNDERLYING FACTS

### A.   Hamas Background

62.   Hamas is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement. Hamas was founded in December 1987 by Sheikh Ahmed Yassin together with Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar and Abd al-Fatah Dukhan.

63.   Hamas is an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

64.   Hamas is nominally divided into three interconnected wings: (i) a political organization, (ii) the "Da'wa" (Hamas' social service or humanitarian component), and (iii) a military operational wing known as the Izz-al-Din al-Qassam Brigades. Although these components have separate responsibilities, the Hamas organization operates seamlessly, with each component working together to conduct and support the military operations and achieve the illegal objectives of the terrorist group as a whole.

65.   Hamas' social services are, in large part, administered by local "zakat" committees and charitable societies.  Hamas either established these committees or coopted them by, *inter alia*, installing Hamas members, operatives and activists as members of the zakat committees' governing bodies. These committees and organizations collect and distribute funds on behalf of Hamas for Hamas' purposes.

66.   The zakat committees played important roles in channeling funds to pay expenses for, and assist the families of, terrorist operatives who were arrested, injured or killed. These entities also assisted with providing housing subsidies to the families of suicide bombers whose

-15-

homes were often demolished by the Israeli army after the bombers' identities had been confirmed. The zakat committees also helped to identify and recruit potential terrorists.

67.     In particular, Hamas routes significant sums that it nominally collects for charitable and humanitarian purposes to terrorist and other operational uses. Even the funds utilized for charitable purposes free up other funds for specific terrorist acts.  Hamas used (and still uses) funds purportedly collected for charitable purposes to, among other things, provide weapons, explosives, transportation services, safe houses, training and salaries for its terrorist operatives and for terrorist recruiters.  And funds used for Hamas' charitable purposes directly support its military operations, as they support Hamas' image-making machine, which increases its fundraising and attracts foot soldier recruits.

68.     As noted above, Hamas is a Foreign Terrorist Organization dedicated to radical Islamist principles and the destruction of the State of Israel. It also uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people.

**B.     Palestine Islamic Jihad**

69.     Founded in Gaza in 1981, PIJ is a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad," or holy war.

70.     PIJ is formally committed to the destruction of the State of Israel and to achieving its objectives by violent means, including acts of terrorism.

71.     Since its creation, PIJ has carried out dozens of terrorist attacks in Israel. These attacks have killed and injured hundreds of Israeli and U.S. nationals.

72.     As with Hamas, PIJ controls dozens of Non-Government Organizations and religious organizations operating in the Palestinian Territories.

73.     As with Hamas, PIJ routes significant sums that it nominally collects for charitable and humanitarian purposes to terrorist and other operational uses. Even the funds utilized for charitable purposes free up other funds for specific terrorist acts. PIJ used (and still uses) funds purportedly collected for charitable purposes to, among other things, provide weapons, explosives, transportation services, safe houses, training and salaries for its terrorist operatives and for terrorist recruiters. And funds used for PIJ charitable purposes directly support its military operations, as they support PIJ's image-making machine, which increases its fundraising and attracts foot soldier recruits.

74.     From at least 1993 through 2020, Hamas and PIJ knowingly, willfully, and unlawfully combined, conspired, confederated and agreed with Defendants to commit numerous acts of international terrorism, as defined by 18 U.S.C. §§ 2331 and 2332, including acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations.

C.     **Hamas' and PIJ's Formal Designation As Terrorist Organizations**

75.     In 1989, the Government of Israel declared Hamas a terrorist organization and designated it an "unlawful organization" because of its terrorist acts. Notice of the designation was placed in the official Government of Israel publication, the Announcements and Advertisements Gazette.

76.     On January 23, 1995, President Clinton issued Executive Order No. 12947, which found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

77.     Executive Order No. 12947 designated Hamas and PIJ as Specially Designated Terrorists ("SDTs") and blocked all of their property and interests in property.

78.     On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated Hamas and PIJ as Foreign Terrorist Organizations ("FTOs") pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996. The designation of Hamas and PIJ as FTOs have been renewed every two years since 1997.

79.     After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

80.     Executive Order No. 13224 designated Hamas and PIJ as Specially Designated Global Terrorists ("SDGTs"). That Executive Order also blocked all property and interests in property of SDGTs, including Hamas and PIJ.

## D.     Sudan's Direct and Deliberate Assistance and Funding of Hamas and PIJ and Provision of Safe Haven to its Leadership

81.     Like any enterprise, terrorist organizations need money to operate. But unlike legitimate organizations, terrorist organizations like Hamas rely on sympathetic nation states and financial institutions who employ creative fundraising strategies to disguise their operations and evade anti-terrorism laws. Often terrorist financing is disguised as charitable contributions.

82.     It has long been the official policy of the government of Sudan to provide material and logistical support to the Hamas and PIJ terrorist organizations.

83.     The Government of Sudan has been one of longest designated regimes on the United States Department of State' list of State Sponsors of Terrorism.

84.     The United States first added Sudan to the list on August 12, 1993 and it remains designated until today.

85.     According to the United States Department of State:

The Government of Sudan provided safe haven and support for members of several international terrorist groups operating in Sudan... The list of groups that maintain a presence or operate in Sudan is disturbing and includes some of the world's most violent organizations: the ANO, the Lebanese Hizballah, the Palestinian Islamic Resistance Movement (HAMAS), the Palestinian Islamic Jihad (PIJ), and Egypt's Islamic Group.

U.S. Department of State, 1995 April: PATTERNS OF GLOBAL TERRORISM, 1994, Department of State Publication 10239.

86.     From the time of its founding in 1987, Hamas, which considered itself the Palestinian branch of the fundamentalist Muslim Brotherhood, capitalized on the Brotherhood's large global network and formed alliances and connections with other Middle Eastern organizations and regimes sympathetic to its fundamentalist ideology.

87.     Among those regimes which embraced Hamas and PIJ was Sudan. Following the 1989 coup by pro-Muslim Brotherhood army officers, Sudan became a safe haven for numerous radical Islamic organizations and was quickly transformed into a regional base for Hamas and Palestine Islamic Jihad, where many of the groups' members were permitted to reside. Sudan provided the Hamas and PIJ members Sudanese passports which enabled them to travel internationally.

88.     In addition to allowing the terrorists groups to maintain bases, Sudan permitted Hamas and PIJ to carry out training, conduct meetings and conferences, fundraise, provided them with safe houses, allowed them to recruit members as well as store deadly weapons.

89.     The Government of Sudan also authorized and maintained a weapons pipeline that permitted Hamas and PIJ to smuggle rockets and other deadly contraband from Khartoum into the Gaza Strip.

90.     Sudan permitted the Government of Iran to sail battleships and cargo ships to the Port of Sudan on the Red Sea, which were laden with rockets and weapons destined for Hamas and PIJ.  Once offloaded in Sudan, the weapons were packed onto convoys of trucks that traveled across Egypt and Sinai, and eventually reached the Gaza Strip. The massive stockpile of rockets that have been smuggled into the Gaza Strip and are continuously launched into Israeli cities and towns by Hamas and PIJ have been brought in from Sudan. Hundreds of Israeli civilians have been killed and maimed in these rocket attacks.

91.     As Dr. Jonathan Scnanzer, Vice President of  the Washington, DC-based Foundation for the Defense of Democracies testified before Congress:

> Sudan, meanwhile, plays a significant role in the smuggling of larger rockets to Hamas, and this does not get a lot of attention. Iran ships these rockets by sea, and they often arrive in Port Sudan. From there, they are smuggled up through Egypt and across the Sinai Peninsula. Sudan has also stored Iranian rockets for Hamas. Notably, Israel bombed the Khartoum warehouse full of Fajr 5 rockets in October 2012.

Joint Hearing Before The Subcommittee on The Middle East and North Africa and the Subcommittee On Terrorism, Nonproliferation, And Trade of the Committee on Foreign Affairs House of Representatives One Hundred Thirteenth Congress Second Session, September 9, 2014 (Serial No. 113-213).

92.     The Government of Israel has continuously attempted to obstruct the Sudanese rocket smuggling pipeline to Hamas and PIJ. On numerous occasions the Israeli air force was suspected of carrying our aerial attacks on the Sudanese convoys destroying them as they traveled across desert regions. In January and February 2009, Israel was accused of two air strikes in Sudan and one in the Red Sea, that targeted Iranian arms being smuggled from Khartoum to the Gaza Strip. The convoys reportedly were transporting 120 tons of arms and explosives to the Gaza Strip, including antitank rockets and long range Iranian Fajir rockets with powerful warheads.

93.     In October 2012, the Yarmouk weapons factory located in the southern region of the Sudanese capitol Khartoum, was attacked by four foreign aircraft. The planes bombed and destroyed the Sudanese government owned factory. The Yarmouk factory was allegedly manufacturing weapons for Hamas and PIJ. Sudan accused the Israeli air force of carrying out the raid.  Both Sudan and Hamas condemned the attack.

94.     In July 2014, a stockpile of long range missiles located in a Khartoum military base was sabotaged and destroyed in a powerful explosion. The base was a key nerve center in the pipeline transporting weapons arriving by sea from Iran and being convoyed and smuggled into the Gaza Strip.

## THE TERRORIST ATTACKS PERPETRATED BY HAMAS AND PIJ

95.     Pursuant to the unlawful conspiracy set out above, the Defendants and their co-conspirators provided material support and resources to Hamas and the PIJ that allowed these notorious terrorist organizations to carry out brutal terrorist attacks against Plaintiffs and/or their family members, which left Plaintiffs severely physically and/or psychologically injured as described below:

-21-

**A.     The Murder of Taylor Force**

96.     In March, 2016, Taylor Force ("Taylor"), a U.S. citizen and business student at Vanderbilt University's Owen Graduate School of Management, joined a school trip to Israel. Taylor was a West Point Graduate and had served with the United States military in Afghanistan and Iraq.

97.     On the evening of March 8, 2016, the young student was walking with classmates on the boardwalk along the seashore in Jaffa, just south of Tel Aviv. What started as an enjoyable night of camaraderie quickly turned into an evening of violence and unspeakable tragedy. At 6:20pm a 22-year-old operative of the terrorist organization Hamas, Bashar Muhammad Abd al-Qader Masalha, from the Palestinian village of Hajjah in the Qalqilya District, had just left the Mahmoudiyah Mosque situated near the Port of Jaffa. Bashar Masalha, who was armed with a knife, began to make his way to Jaffa's seaside Promenade.  He was determined to kill Israelis and others visiting this popular tourist attraction.

98.     A short distance from the Mosque, Bashar Masalha withdrew his knife and began to repeatedly stab a group of Russian tourists he encountered. After stabbing these innocent visitors, he ran in the direction of the seashore.

99.     Upon arriving at the crowded Promenade, the terrorist continued with what would be a brutal, 15-minute stabbing spree along the Tel Aviv coast. As he slashed and stabbed his innocent victims he loudly shouted "Allahu Akbar" ("G_d is Great") at his stunned prey.

100.     Bashar Masalha approached a group of American tourists, one of whom was Taylor. He plunged his knife into the unsuspecting student, leaving him badly bleeding and in critical condition. The terrorist continued running in a frenzy and stabbing many other victims, both Israelis and foreign citizens alike.

-22-

101.    Police who arrived on the scene began to pursue Bashar Massalha. He was eventually shot dead after being located near the Jaffa Port Promenade.

102.    In the course of his stabbing spree he had murdered one individual and grievously wounded ten others, including a pregnant woman.

103.    Bleeding heavily and unconscious, Taylor was rushed to the Wolfson Medical Center, but was pronounced dead on arrival.

104.    Israeli security investigators interviewed Bashar Massalha's relatives after the attack. They discovered that the terrorist had just returned the day before from a three-week long religious pilgrimage (Umrah) to Mecca in Saudi Arabia. Instead of attending a family celebration organized for his return, he had disappeared and traveled to Tel Aviv. Before smuggling himself into Israel, Bashar Masalha posted on Facebook messages that implied that he sought to die as a martyr (*shahid*) by killing Israelis.

105.    Shortly, after Taylor's murder, the Hamas terrorist organization posted a statement on its Twitter account announcing the death of "our son, the martyr holy warrior Bashar Muhammad Masalha, who carried out the heroic stabbing attack in Jaffa, which led to the death of a Zionist and the injury of ten people."

106.    In addition, Hamas' responsibility was clearly expressed both in media channels known to be affiliated with the terrorist organization and in other Palestinian media: Hours after the attack, photos and messages from Massalha's Facebook account were posted to the PALINFO website (affiliated with Hamas) and on the group's twitter page with the caption: "A photo of the living Shahid hero Bashar Muhammad Massalha, 22, who carried out the stabbing operation in the occupied city of Jaffa."

107.    On March 11, the PALINFO website reported the attack, calling it a "heroic operation" in which Bashar Masalha killed a "settler" and injured 13 additional persons.

108.    The dead terrorist was publicly and proudly identified by the Hamas organization as "a son of the Hamas movement", thus receiving recognition by the group as a rank and file operative sent to carry out the attack upon the urging, and on the behalf of, the organization.

109.    The news website Mashreq News (an Iranian platform, supportive of the Hamas organization) wrote "Masalha's friends say that he was extremely enthusiastic ('Mutahames') prior to the Umrah..." Attached to this news report was an excerpt from the Hamas' announcement concerning Masalha, which was circulated online, saying: "The Hamas movement in Qalqilya District is eulogizing its son, the Shahid holy warrior." The website article continued: "... The Hamas movement announced the death of the Shahid Masalha and described him as its son, a holy warrior Shahid, praising him for his courageous stabbing operation in Jaffa, which led to the death of an Israeli and to the injury of ten others. The Shahid was known in his village for his virtues and religious commitment..."

110.    At Bashar Masalha's funeral, mourners were seen bearing Hamas flags and shouting enthusiastic cries of support for Ahmad Yassin, the founder of the Hamas organization. Eulogies enthusiastically praising Masalha's murderous attack were delivered to the crowd.

111.    At the time of his murder in 2016, Taylor Force was a 28-year-old military veteran and West Point graduate who was on track to graduate in 2017 with an MBA from Vanderbilt University. As a result of his murder, Taylor's estate has suffered economic losses in the form of Taylor's lost future income and benefits. His estate is also entitled to recover damages for Tyler's emotional distress, and pain and suffering, during and in the immediate aftermath of the stabbing attack.

112.     Plaintiffs Stuart Force, Robbi Force and Kristin Ann Force were devastated to learn the tragic news that their son and brother, Taylor, had been so violently killed. Taylor was the center of his parents' lives and they were crushed by the pain and the void they now experience. He had always had an extremely close relationship with his sister, and now Taylor was gone and her life is bitterly impacted. The Force family has never returned to the routine and life they enjoyed before the murder. The Force family suffered severe and on-going psychological and emotional injuries, and mental anguish, as a result of loss of solatium, and loss of Taylor's society and companionship. For his family, the wound of losing Taylor does not heal.

**B.     The Shooting of Eli M. Borochov**

113.     On Friday, November 6, 2015, another U.S. citizen, Eli M. Borochov ("Eli"), who was 20 years old at the time, his father Ronen, and his 6-year old brother, Yosef, were walking peacefully up the steps to enter the Maharat Hamachpela, the Cave of Patriarchs, a holy site in Hebron, Israel. Chaos soon ensued.

114.     Two Hamas terrorists, who had set up a sniper position nearby, began firing on the crowd at the entrance to the Cave. The terrorists used an SKS sniper carbine with telescopic sights, fitted with an improvised silencer that the terrorists themselves had fashioned. The pair fired from a window, which overlooked the courtyard of the Cave, in a building that belonged to their father. The sniper first shot Eli in his thigh and testicles as he ascended the steps. Moments later the shooter again opened fire and injured another young man, Micha Gedaliah. A bullet lodged in Eli's leg and he fell to the ground screaming in agony. He laid on the ground unable to stand up and was bleeding heavily from his wounds. Shortly afterwards, emergency medical personnel and the army arrived upon the scene. Eli was evacuated from the entrance of the Cave to the Shaare Tzedek Hospital in Jerusalem for emergency surgery. Eli was in severe pain following the removal of the

bullet and he continued to suffer for many months afterwards. He still experiences a great deal of psychological trauma over having been shot. He frequently has nightmares about the shooting. The pain, both physical and emotional, accompanies him in all his activities until today.

115.    Eli's father, Ronen Steven Borochov, and his brother, Josef S. Borochov, who were present during the shooting attack and witnessed Eli being injured, suffered extreme mental distress as a result of this traumatic experience.  Ronen and Josef feared for their own lives, as well as Eli's. They continue to experience mental anguish as a result of the shooting attack and as a result of witnessing Eli's physical and emotional suffering.

116.    Eli's other two siblings, Shira Nechama Borochov and Avraham M. Borochov, suffered mental anguish upon learning of the shooting attack on their father and brothers, and as a result of witnessing Eli's physical and emotional suffering.

117.    Eli's wife, Shari Mayer Borochov, has suffered mental anguish as a result of witnessing the on-going physical and emotional suffering of her husband.

118.    Following the attack, the Hamas organization took responsibility for the shooting and identified the perpetrators as Hamas operatives from its operational terrorist wing, the Izz a-Din al-Qassam Brigades. The Israeli Security Agency ("ISA") identified the two gunmen as members of a Hamas cell, brothers Nasr and Akram Badawi. The cell members were eventually arrested in January 2016. Based upon their subsequent confessions to Israeli authorities, it was confirmed that they were members of Hamas. The cell members were convicted in an Israeli court, on the basis of their statements, of membership in the Hamas organization, of establishing a Hamas terror cell and of perpetrating a large number of shooting attacks (including the attack that grievously injured Eli) with the purpose of killing as many Jews as possible. Two other members of the cell were Nasr and Akram's father, Feisal Badawi who was a partner in planning the cell's

operations and agreed to fund the purchase of weapons, and Ata Abu Rumuz who organized the cell and was arrested on September 9, 2016. He was sentenced to 11 years' imprisonment.

119.    The two cell members who wounded Eli were sentenced to life imprisonment, as the court was convinced that only by luck did Eli and the others remain alive, merely wounded by the terrorist shooting, while the cell members had been determined to murder them.

120.    The Hamas organization publicly acknowledged (on websites recognized as official websites of the organization, and on others identified with the terror group) the fact that the members of the terror cell that perpetrated the shooting attacks were operatives of Hamas' Izz a-Din al-Qassam Brigades. Thus, the organization demonstrably took responsibility for the shooting attacks that the cell perpetrated, including the attack that wounded Eli. The names of the cell members who were captured and later tried appear in the list of prisoners from the Hamas organization who are in Israeli prisons, which is published on the organization's official websites.

121.    The ISA also independently determined, according to an official document of its own, that the sniper group was a Hamas cell and that its members were operatives of the terrorist organization.

### C.    The Kidnapping and Murder of Y.N.F.

122.    On Thursday night, June 12, 2014, two Hamas terrorists drove a stolen vehicle with Israeli license plates to the Gush Etzion area, southwest of Jerusalem, Israel looking for a Jew to kidnap. The mission was part of Hamas' plan at that time to kidnap Jews to use them as bargaining chips in negotiations for the release of Palestinian prisoners held in Israel.

123.    At around 10:30 p.m., the Hamas terrorists spotted three boys, 16-year-old U.S. citizen Y.N.F., together with two Israeli teenagers, at a hitchhiking post in Gush Etzion on their way home from school.

-27-

124.    Y.N.F. was a gifted student who was interested in many different academic and religious subjects. He loved sports and greatly enjoyed the hours he would spend after classes with his brothers and sisters. On the Sabbath he would attend synagogue with his father and family.

125.    On the night of June 12, the Hamas terrorists picked up Y.N.F. and his two friends, misleading them to believe they were taking them to their desired destination. After the boys were seated in the back seat of the car, one of the terrorists pulled out a pistol, pointed it at the boys, told them they were kidnapped, and ordered them to keep quiet. During this time, one of the other teenagers managed to place an emergency call and state in a whisper that he had been kidnapped, which ultimately enabled the Israeli police to trace the location of the boys to the Hebron area.

126.    Tragically, shortly after the abduction, the terrorist gunman panicked and decided to murder all three boys. Each boy was brutally shot to death in the back seat of the car at point blank range.

127.    The two Hamas terrorists then continued driving toward Hebron until they reached the outskirts of the village of Duma, where they wrapped the boys' bodies in black plastic bags and moved them to a getaway car that was parked there. They poured gasoline on the kidnapping vehicle and set it on fire with the boys' personal belongings inside. They then drove the new getaway car to Wadi Hasaka, where they threw the boys' bodies in a land plot, and then returned to Hebron.

128.    Later that night, they went back and moved the bodies to a plot of land that Hussam owned, where they buried the bodies and covered them with earth, gravel and uprooted bushes in order to better conceal them. They then buried the boys' clothes nearby, and disposed of the tools and plastic bags that had been used to wrap the bodies. The Israeli government, IDF and security services began a massive two week long search for the abducted teenagers and manhunt for their

captors. The operation codenamed, "Brother's Keepers", deployed thousands of individuals who searched the entire West Bank for the missing teenagers. The State of Israel, foreign governments and millions of concerned people around the world maintained a prayer vigil as the desperate search continued for the missing boys.

129.   During the search operation, the Hamas terrorist organization continued to praise the abduction as a heroic military operation. The terrorists posted messages on social media urging Palestinian residents and businesses in the area of the kidnapping to thwart the Israeli efforts by destroying surveillance videos and refusing to cooperate with investigators.

130.   Finally, on June 30, 2014, a search team found the bodies of the three teens, all found to have been murdered by close range gunfire, hidden in the field owned by Hussam.

131.   As a result of the kidnapping and murder, Y.N.F.'s family members have suffered and continue to suffer extreme psychological and emotional harm.

132.   From the evening Y.N.F. did not come on June 12, 2014, until the discovery of his hidden body on June 30, 2014, Y.N.F.'s family members were in agony not fully knowing the fate of their son and brother.

133.   These feelings of mental anguish and emotional distress were only exacerbated once Y.N.F.'s body and the bodies of his two friends were found, brutally murdered and dumped in a makeshift pit.

134.   On August 5, 2014, Israel announced that it had arrested Hussam Kawasma in connection with the kidnapping and murder of Y.N.F. and the two other teenagers. By the time of his arrest, Hussam had shaved his beard and received a fake passport in an attempt to flee to Jordan.

135.   Hussam confessed to planning and preparing for the Hamas kidnapping operation that led to the murder of Y.N.F.

136.    Among other things, Hussam admitted that he obtained funds from Hamas for the operation, procured weapons to be used in the kidnapping, assisted in burying the bodies, destroying evidence, and sheltering the two Hamas kidnappers.

137.    On December 31, 2014, Hussam was convicted by an Israeli court of three counts of accessory to premeditated murder, membership in a group that committed intentional murder, two counts of bringing enemy funds into the country, carrying out the activities for Hamas, arms dealing, two counts of obstruction of justice, and sheltering wanted individuals.

138.    On January 6, 2015, the Israeli court sentenced Hussam to three life sentences for his role in the kidnapping and murder of Y.N.F. and the two other teenagers.

139.    On August 20, 2014, senior Hamas leader Saleh al-Arouri ("al-Arouri"), a member of the Hamas Politburo, gave a public address at a conference of the International Union of Muslim Scholars in Istanbul, Turkey, in which he declared that Hamas had directed the kidnapping operation in which Y.N.F. was abducted and murdered.

140.    Al-Arouri has been identified as the terrorist mastermind behind the operation.

141.    After al-Arouri's speech, Hamas' Felesteen and Safa Press Agency both used Facebook to provide access to the video of Al-Arouri's speech announcing that the kidnapping and murder of the three boys was a Hamas operation.

142.    In September 2014, Israeli investigators learned the hideout location of the two fugitive Hamas kidnappers. In the early morning hours of September 23, 2014, special Israeli police forces surrounded a building in Hebron where Marwan and Amer were hiding. Marwan and Amer both died in a shootout with police.

143.    Senior Hamas officials praised the abduction and called the Hamas kidnappers "martyrs" and "heroes."

-30-

144.    Y.N.F. suffered unspeakable terror, pain and anguish during his captivity up to and through his brutal murder. While he was in the terrorists' custody, knowing that he had been kidnapped and while being threatened with a pistol, the 16-year-old Y.N.F. suffered extreme mental anguish, knowing that his life and the lives of his friends were at risk; that they were in danger of being beaten or otherwise abused by their captors, and that their family members would be distressed to learn that they had been kidnapped. Y.N.F.'s estate seeks recovery for those damages caused by his kidnapping and murder.

145.    Moreover, the family of Y.N.F. suffered tremendous pain and anguish as a result of his murder by Hamas terrorists. His parents as well as his siblings had a very close personal relationship with the gentle teenager. The loss suffered by the family has never healed and not a day passes without them intensely feeling his absence. The shocking murder and horrific ordeal filled the family with fear, grief and a prolonged sense of depression. Each member of this close-knit family continues to feel the pain in their own personal manner. The family continues to intensely grieve for their murdered son and brother until today.

146.    Y.N.F.'s parents, Abraham Ron Fraenkel and Rachel Devora Sprecher Fraenkel, have suffered, and continue to suffer, severe mental anguish as a result of loss of solatium, and loss of Y.N.F.'s society and companionship.

147.    Y.N.F.'s siblings, Tzvi Amitay Fraenkel, A.H.H.F., A.L.F., N.E.F., N.S.F. and S.R.F., have suffered, and continue to suffer, severe mental anguish as a result of loss of solatium, and loss of Y.N.F.'s society and companionship.

**D.      The October 29, 2014 Shooting of Yehudah Glick**

148.    Yehudah Glick ("Yehudah") is a fifty-four-year-old former American citizen living in Israel. He is an ordained rabbi. Earlier in his career Glick had served in the military as a combat

medic. He had also worked as an assistant to an Israeli government minister and was employed by a number of religious organizations in Jerusalem. Yehudah is married with 6 children who depend on him for financial and emotional support. At the time of his injury in a PIJ terrorist attack, Yehudah was a U.S. citizen.

149.    On the evening of October 29, 2014, at approximately 10 p.m., an operative of Palestinian Islamic Jihad ("PIJ,"), Mu'taz Ibrahim Khalil Hijazi, armed with a gun, and acting on behalf of PIJ, arrived by motorcycle at the Menachem Begin Heritage Center in Jerusalem where Plaintiff Yehudah Glick was attending a conference. After confirming Yehudah's identity, the terrorist fired four shots at Yehudah from close range and critically wounded him in the chest.

150.    After carrying out the shooting attack Mu'taz Hijazi fled the scene on a scooter.

151.    The assassination attempt was caught on surveillance cameras located at the scene of the attack.

152.    Badly bleeding and unconscious Yehudah was evacuated in critical condition to Shaare Zedek Hospital in Jerusalem where he fought for his life for several days.

153.    The shooter, Mu'taz Hijazi, had identified Yehudah as the target he wished to murder. Right before he opened fire he stated: "I am terribly sorry, but I have no option—you are the enemy of Al-Aqsa." Then he began to fire his gun.

154.    The security forces (the Israel Police and the ISA) managed to quickly identify the terrorist shooter as Mu'taz Hijazi. He was known to the security forces in Israel as a PIJ operative. During a prior imprisonment, in 2004, he had joined the ranks of the terrorist group. He had served 11 years in Israeli prisons for terrorist activities.

155.    A few hours after the attack, the security forces arrived at his home to arrest him.

-32-

156.    Mu'taz Hijazi, however, spotted the police approaching, came out to the roof of his house carrying a gun and opened fire. He was quickly killed by the police, who returned fire, in the exchange.

157.    Following the attack, the PIJ claimed responsibility for the murder attempt. Media outlets, including websites identified with the PIJ and the terrorist groups' senior leaders—all referred to Mu'taz Hijazi as a member of the PIJ's operational arm, known as the Saraya al-Quds (Al-Quds Brigades).

158.    On October 30, 2014, the day Mu'taz Hijazi was killed, a website affiliated with the PIJ published photos from the confrontation between the terrorist and the security forces on the roof of the building he lived in, and wrote the following: "This morning, Thursday, the Palestinian Islamic Jihad movement announced the death of its martyr, the warrior (mujahid) Mu'taz Hijazi, who was killed in the Al-Thawri neighborhood in Jerusalem, after confrontation with the occupation forces."

159.    After arriving at the hospital Yehudah underwent several emergency surgeries. He remained on a respirator for almost two weeks, and in the hospital for close to one month. The ordeal left him badly weakened. During all that time, both in the hospital and months after his release, he was often in excruciating agony.  He required physical therapy. He suffered nightmares and feelings of trauma and extreme anxiety. Over and over again he replayed the attempted murder in his head. He had trouble walking for months and even sleeping at night was terribly painful. Yehudah was unable to return to work until many months after the attack and is still haunted by the memories of the brutal shooting.

160.    Yehudah's family, which was shocked by the news that their beloved father and husband had been almost killed, grew very fearful after the shooting. His children, Neria David

Glick, Shlomo Glick, Hallel Glick, and S.G., suffered mental anguish witnessing Yehudah's suffering and worrying ceaselessly about losing their dear father. Yehudah's wife, Yaffa Glick, was inconsolable and afraid for the future. The family suffered excruciating psychological and emotional harm from the attempted murder ordeal that continues to affect them until today. Yehudah also still experiences pain and suffering, and mental anguish.

**E.       The October 12, 2015 Murder of Richard Lakin**

161.    Richard Lakin ("Richard") was a U.S. citizen living in Israel in 2015. He was 76 years old at the time, a retired school principal from Connecticut. In his younger years Richard had been in the American civil rights movement and had traveled through the South as a Freedom Rider. In Israel, Richard had taught many Arab children in the course of his career and was an advocate for peaceful coexistence between all the communities in the Middle East.

162.    On the morning of October 13, 2015, Richard boarded Jerusalem Bus Number 78 on his way to meet with friends. Prior to his boarding the bus, two Hamas operatives, one armed with a gun and the other with a knife, entered the bus. The terrorists, Bahaa' Alyan and Bilal Abu Ghanem, waited until the bus filled up with passengers and then commenced their brutal violence. The assailants signaled to each other to start the attack and Bilal Abu Ghanem drew out his gun, walked toward the back of the bus and started shooting at close range, targeting the heads and upper bodies of the passengers with the intention of murdering them. At the same time, his accomplice, Bahaa' Alyan, drew his knife and targeted the passengers sitting at the front of the bus, stabbing them in all parts of their bodies, especially in their upper bodies, with the intention of murdering them. According to the passengers' statements, the two terrorists shouted "Allahu Akbar", ("G-d is Great"), while perpetrating the murders.

-34-

163.    When the bus driver realized it was a terror attack, he stopped the bus and opened the doors to let people flee the terrorists. The driver escaped from the bus but then the terrorists closed the doors to trap the other passengers inside.

164.    Bilal Abu Ghanem used all of the bullets he had and Bahaa' Alyan stabbed as many passengers as he could. According to the surviving passengers' police statements, Bilal Abu Ghanem continued stabbing passengers using the knife Bahaa' Alyan had used before, until the knife broke and remained stuck inside Richard's body.

165.    Two passengers were killed during the course of the massacre. Nine others were injured, three of them seriously, among them Richard, who had been shot in the head and stabbed in the stomach and face. He was taken from the bus to the hospital unconscious and arrived in critical condition. His shocked family rushed to the hospital and did not leave his side. Two weeks later, on October 27, 2015, after numerous emergency procedures, Richard died of his wounds, raising the death toll in the attack to three.

166.    When the alarm had been sounded, Policemen and Border Police officers quickly arrived at the scene. They boarded the bus, then shot and killed Bahaa' Alyan, and wounded Bilal Abu Ghanem.

167.    After his capture, Bilal Abu Ghanem was interrogated and provided the ISA with a confession. He stated that the two terrorists had planned the attack in advance.

168.    Bilal Abu Ghanem was a known Hamas operative when he executed the terrorist attack. His affiliation in the terrorist group was mentioned both in a court ruling in this matter, and in the verdict handed down in Abu Ghanem's criminal prosecution it states that he was affiliated with Hamas since early 2013.

169.    In a statement given to police investigators in a previous arrest in 2013, Bilal Abu Ghanem revealed the fact that he knew and had connections with his cousin from the Jenin area in the West Bank, whom he described as a Hamas operative. That same cousin was prosecuted by Israel for an attempt to carry out a double suicide attack and was sentenced to 20 years in prison.

170.    Between September 2013 and October 2014, Abu Ghanem was imprisoned on account of his activity within Hamas' Islamic Bloc. In his statements to police in connection with this imprisonment, Abu Ghanem described in great detail his position in the Islamic Bloc and the methods by which the Islamic Bloc recruits students.

171.    Abu Ghanem admitted to his interrogators that the Islamic Bloc is a part of the Hamas organization and that at times it is convenient for Hamas to carry out its activities via the student Bloc.

172.    Photos taken on the day of his release from prison in 2014, depict Abu Ghanem being carried on his friends' shoulders, dressed in Hamas symbols and colors, including a green scarf with the Hamas emblem. Abu Ghanem was closely acquainted with the head of the Islamic Bloc at Al-Quds University, and that he was well aware that the Islamic Bloc's activities were illegal.

173.    A Hamas website refers to Bilal Abu Ghanem as an operative of the terrorist organization and his name appears—publicly and openly—on the Hamas prisoners' website, where he is referred to as a Hamas prisoner.

174.    After the Bus 78 attack, a picture of Bilal Abu Ghanem wearing clothes with Hamas symbols was also circulated on the Internet. The picture contains writings with Hamas characteristics (such as Quranic verses often quoted by operatives and spokesmen of the Izz al-Din al-Qassam Brigades, praising the path of Jihad).

175.    Abu Ghanem's Hamas membership was also made public after the attack in a written declaration published by "The Popular Front for the Liberation of Palestine" terror organization which stated that Abu Ghanem was a commander in the Izz al-Din al-Qassam Brigades.

176.    Hamas praised the attack, stating it is "a message to anyone who harms our holy places," and calling for a continuation of "the intifada." Hamas further created a video reenactment of the Bus 78 attack and published it on the Facebook page of one of its West Bank affiliates.

177.    Richard's children, Plaintiffs Micah Lakin Avni and Manya Lakin, suffered mental anguish as a result of the brutal attack on their father which left him in a coma for two weeks, and as a result of his subsequent untimely death. They dropped everything and remained at the hospital by his side for the entire period. They, and Richard's daughter-in-law Rita Avni, were traumatized and distraught and continue to suffer loss of solatium, and loss of Richard's companionship, society, and parental guidance.

178.    Richard's grandchildren Shachar Boteach, Y.L., R.A., and V.A.; his step-grandchild E.A.; and his great-grandchild D.A.B., have suffered mental anguish, loss of solatium, and loss of Richard's companionship, society and guidance.  The young children grew very fearful and anxious as a result of the loss of their beloved grandfather and great-grandfather. They all reacted to the stressful period of Richard's hospital procedures and his death very intensely. The entire family suffered severe psychological emotional harm as a result of the attack on Richard that continues until today.

## F.      The Murderous Car Ramming Attack on the Braun Family

179.    On the afternoon of October 22, 2014, U.S. citizens Shmuel Elimelech Braun, Chana Braun and their infant daughter C.Z.B. were disembarking from the light rail at the

Ammunition Hill station in Jerusalem. Chana was pushing baby C.Z.B. in a stroller. As they exited the station, a Hamas terrorist purposefully drove his car at a high speed into the crowd of passengers leaving the train with the intention of causing injury and/or death to as many civilians as possible.

180.    The terrorist, Abd al-Rahman al-Shaludi, from the Jerusalem neighborhood of Silwan had taken his mother's car in order to carry out the attack. He sped past the light rail tracks, where cars are prohibited, and crashed into the platform area, striking many passengers. The terrorist struck three-month old C.Z.B.'s stroller causing the infant to be thrown some ten meters into the air. C.Z.B. landed on her head on the pavement fatally wounded, while her mother Chana screamed in horror. C.Z.B.'s father Shmuel was also knocked over and badly injured by the car.

181.    His entire body was filled with pain and he could not stand up. He laid on the floor writhing in agony and having trouble breathing.

182.    Another nearby victim, a woman was killed and seven other people were badly wounded.

183.    After his car crashed into the platform, Abd al-Rahman al-Shaludi escaped through the window and fled the scene. A number of people started chasing him and called him to stop. As the terrorist attempted to continue his escape, he was shot at by one of the security men who was pursuing him. The terrorist fell and was badly injured. He was evacuated to a hospital in critical condition and died of his wounds several hours later. When rescue personnel arrived on the scene of the attack, they found baby C.Z.B. with no pulse and serious head injuries. They succeeded in resuscitating C.Z.B. and obtaining a pulse. They then transported her, connected to a ventilator and in critical condition, to the nearby Hadassah Mount Scopus Hospital. Despite these efforts, baby C.Z.B. was pronounced dead some two hours after her arrival at the hospital. Shmuel was

also evacuated to the hospital for emergency treatments. Still suffering from his physical injuries, he was horrified to learn that his baby daughter had been killed.

184.    Shmuel was able to survive his injuries, but only after much difficulty. For many months he experienced intense physical and psychological pain and trauma. The memories of the attack haunted him. He had trouble moving about and could not sleep at night. The pain at times was too much to bear. In addition to suffering such serious injuries, Shmuel and his wife Chana underwent the unspeakable anguish of losing their infant daughter C.Z.B. to such a senseless act of terrorism. That loss was especially devastating because C.Z.B. was the long-awaited child for her young parents, who had tried to conceive unsuccessfully for a long time before baby C.Z.B. was born.

185.    Plaintiff Chana Braun suffered psychological and emotional harm watching the unthinkable unfold. One minute she was enjoying a day with her family pushing her darling baby's stroller, the next moment her infant daughter was smashed to the ground, obviously critically wounded as a result of a brutal terrorist attack. She was unable to continue on with her life after the devastating loss of her infant child.

186.    Plaintiff Shmuel Elimelech Braun suffered severe physical injuries as well as psychological and emotional harm as a result of the attack. He witnessed the car strike his wife and infant daughter's stroller and saw his infant daughter being thrown some ten meters into the air and land on her head unconscious. For many months afterwards Shmuel was unable to resume his previous life. He was unable to continue on with any routine after the devastating loss of his infant child.

187.    The couples' mental anguish over C.Z.B.'s death continues to plague them until today, and they continue to suffer loss of solatium, and loss of C.Z.B.'s companionship and society.

188.     C.Z.B.'s grandparents Shimson Sam Halperin, Sara Halperin, Murray Braun, and Esther Braun suffered severe mental anguish upon learning of the horrific murder of their grandchild and the injuries suffered by their son and son-in-law, Shmuel. They continue to suffer loss of solatium and loss of C.Z.B.'s companionship and society to this day.

189.     Hamas publicly praised the attack and referred to the attacker as a "martyr" and "hero."

190.     Importantly, the car ramming and the murder were referred to as an attack - not an accident - by Hamas and by other organizations that praised the terrorist in the death notices they published for him, in their speeches and in other statements. Hamas recognized Abd al-Rahman al-Shaludi as one of its operatives.

191.     After the attack, Israeli investigators discovered that the terrorist had previously taken part in other violent activities and had been arrested and sentenced before. Abd al-Rahman Al-Shaludi's terrorist past was well known to the security and intelligence services.

192.     Hamas issued a death notice for the terrorist recognizing him as one of their members, which read: "The Islamic Resistance Movement mourns the death of its son, the martyr, the hero Abd al-Rahman Idris al-Shaludi.

193.     During the course of his funeral, mourners carried Hamas-affiliated flags, and the terrorist's body, which had been wrapped in white shrouds before the burial, was now wrapped in a green Islamic shroud for the funeral. This was a symbol of Abd al-Rahman al-Shaludi's affiliation with the Hamas movement.

194.     After his death, the family's house was decorated with green flags bearing Quranic verses, which are considered Hamas banners.

195.    This gruesome Hamas terrorist attack utilizing a vehicle which was driven at high speeds into a crowd of innocent pedestrians was later copied by other terrorist groups in attacks perpetrated worldwide including in Europe, the United States and Asia.

**G.    The January 27, 2016 Stabbing of Menachem Mendel Rivkin**

196.    Husband and wife Menachem Mendel Rivkin ("Menachem") and Bracha Rivkin ("Bracha") were U.S. citizens living in Israel.

197.    On January 27, 2016, at approximately 10:00 p.m., Ubada Aziz Mustafa Abu Ras, a young Palestinian resident of a village near Givat Ze'ev, just north of Jerusalem, left his home armed with a knife hidden under his clothing. He had decided to carry out a terrorist attack against Israelis. Before embarking on the operation, Ubada Abu Ras posted a message on Facebook reading: "I ask Allah to grant me the Shahada (death of martyrdom)."

198.    The terrorist left his village heading to a nearby Israeli military checkpoint (known as Al-Jib Crossing), planning to stab a soldier. When he noticed that the soldiers at the checkpoint were inside the guard post which made it more difficult for him to attack them, he changed his plan. Instead he proceeded to a gas station in Givat Ze'ev in order to find an Israeli to kill.

199.    At approximately 11:00 p.m., Ubada Abu Ras approached a restaurant situated in the gas station area and noticed Menachem and Bracha (who was in her sixth month of pregnancy) exiting their car. The terrorist swiftly trailed the couple, drew his knife and savagely stabbed Menachem in the upper left side of his back. Bracha watched in horror as the terrorist attempted to murder her husband.

200.    Ubada Abu Ras pulled the knife out of Menachem's body and attempted to flee the scene.

201.    Before he could escape, however, others present at the attack overpowered the terrorist and neutralized him until the security forces arrived.

202.    The grievously injured Menachem was evacuated by a medical team to a hospital for treatment where he underwent emergency surgery.

203.    Prior to the attack, Ubada Abu Ras had posted numerous times on Facebook expressing his admiration for Palestinians perpetrating terror attacks against Israelis, including stabbing attacks.

204.    His father, Aziz Mustafa Abd al-Qader Abu Ras, had a long history of arrests by Israeli security forces for terrorist activities and was a known senior Hamas leader. The father was one of the earliest founding members of Hamas who had been arrested and deported by Israel in 1992 to South Lebanon pursuant to their involvement in illegal activities, terrorist incitement and violent attacks against Israelis.

205.    On the day of the attack, January 27, 2016, a photo was posted on the Twitter account of the Hamas-affiliated PALDF web forum, depicting Ubada Abu Ras holding the green flag of Hamas, with the caption "The executor of the heroic stabbing operation." On the banner it is written that the terrorist is the son of Aziz Abu Ras.

206.    Additionally, on that day, Ubada Abu Ras posted a photo online, of a man wrapped in a keffiyeh (a traditional Arab scarf usually worn around the head), holding a knife in his hand, and an inscription in praise of stabbing attacks. The same post also appeared on the Twitter account of the Hamas-affiliated PALDF web forum.

207.    On internet websites identified with Hamas, the attempted murder perpetrated by Ubada Abu Ras was characterized as "a heroic stabbing operation," which took place in "the settlement Givat Ze'ev." Other Palestinian websites posting about the incident explicitly pointed

out Ubada Abu Ras's family credentials of being the son of senior Hamas member Aziz Abu Ras. One of the Hamas affiliated websites boasted of the stabbing and noted that the sons of Hamas leaders do not exclude themselves from taking part in terrorist operations that endangers their lives.

208.    After being stabbed, Menachem was rushed to the hospital in excruciating pain with life-threatening injuries. He was immediately admitted to the intensive care unit.

209.    Menachem remained in intensive care for five days, and was hospitalized for a total of eight days. Due to his serious injuries he was unable to move without pain for several months. Menachem continues to suffer mental anguish as a result of the stabbing attack.

210.    Plaintiff Bracha Rivkin, who witnessed the attack and its aftermath, suffered severe psychological and emotional injuries as a result of the barbaric stabbing of her husband. As a result of the trauma, she no longer feels comfortable traveling outside her home. Bracha is anxious and uncomfortable when she recalls the attack, as she frequently does. She had many nightmares from the shocking experience and believes that her husband and herself came close to being murdered. Her psychological distress and mental anguish continue until today.

211.    Plaintiffs S.S.R., M.M.R., R.M.R., S.Z.R., and S.R., the minor children of Menachem Mendel and Bracha Rivkin also suffered severe psychological and emotional injuries as a result of the attack in which their parents were assaulted and their father was severely physically injured. They have grown very fearful for their parents' safety and remain anxious whenever the attack or terrorism in general is discussed. These emotional conditions and mental anguish continue to plague them until today.

## H.    The December 14, 2016 Car Ramming Attack

212.    On December 14, 2015, at approximately 3:00 p.m., a 21-year-old resident of the neighborhood of Beit Hanina in Jerusalem, Abd al-Muhsin Shaher Hasouna, deliberately drove

his car into fourteen people who were waiting at a bus station near the main western entrance to the city of Jerusalem, near the Bridge of Strings. The station was crowded with passengers during the beginning of the rush hour.

213.   As he neared the crowd, Abd Hasouna accelerated and plowed into the waiting passengers. The car struck fourteen individuals including a baby in a carriage who was severely injured.

214.   It had been Abd Hasouna's plan that once his car was stopped, he would exit the vehicle and kill additional people with an axe that he had brought along. However, before he could leave the car, the terrorist was shot by an armed passerby. He was found dead with his hand extended toward the green-painted axe.

215.   Before the attack Abd Hasouna had hinted to his mother of his intention to carry out a suicide attack and the day before stated his desire to attain paradise.

216.   On the day of the attack he visited the mosque where he prayed and where he distributed candies to celebrate his intended attack. The day the terrorist chose for the attack, December 14th was the 28th anniversary of the founding of the Hamas terrorist organization.

217.   Following the attack, a Hamas-affiliated online forum (PALDF) reported the car-ramming with details but did not claim responsibility. A day later, the terrorist organization published a poster glorifying and praising the terrorist's deed of heroism and declaring Abd Hasouna, a "son of the Hamas movement", which is to say a Hamas operative.

218.   The Hamas radio station, Voice of Al-Aqsa, noted in a poster published on its website on December 16, 2015, the link between the terrorist's Hamas affiliation and the date of the terror attack (the anniversary of the founding of Hamas). In this poster, Abd Hasouna is termed shahid al-Intilaqa, Arabic for "Martyr of the day of founding". This poster shows a picture of the

terrorist with a Palestinian flag and a green Hamas flag above him. The same site also refers to the Shahid Hasouna as "one of the sons of the Islamic resistance movement Hamas, whose heroic operation, carried out on the 28th anniversary of the founding of the resistance movement, has ensured the continuation of the tradition of resistance, and of actions that the movement has adopted since its founding."

### i.      Injuries Suffered by Plaintiffs Yoav Golan and Rotem Shoshana Golan

219.    Yoav and Rotem Golan were a married couple and living in Israel.

220.    On December 14, 2015, Yoav and Rotem were among the passengers waiting at the bus station, and both were struck by Abd Hasouna's vehicle and powerfully thrown to the ground. Shocked and fearing for their lives they managed to get on their feet and run to safety. The entire area of the ramming attack descended into chaos as panicked passengers fled while police and emergency responders arrived on the scene, navigated the hysterical crowd and tried to provide aid to the injured victims.

221.    Both Yoav and Rotem were seriously injured in the attack. They were evacuated from the scene and rushed to the hospital in Jerusalem for treatment. Yoav sustained serious physical wounds from the ramming attack, including to his leg and shoulder. Due to his injuries Yoav was wheelchair bound for a period of time.

222.    Rotem also sustained physical injuries, including lacerations to her knees and a hamstring injury.

223.    As a result of the bus top terrorist attack, Yoav and Rotem received a long period of psychological treatment because of the physical, emotional and psychological harm. They believed that they came very close to being killed by the terrorists' car as many others have in other ramming attacks. They continue to suffer mental anguish as a result of the attack.

-45-

224.    Yoav's mother, Plaintiff Yehudit Golan; his grandparents, Plaintiffs Cici Jacobson and Eddy Jacobson; and his brother, Plaintiff Matan Golan have all suffered mental anguish and serious psychological and emotional harm as a result of learning of the attack and the injuries Yoav and Rotem suffered.

### ii.    Injuries Suffered by Noam Michael Shamba

225.    Noam Michael Shamba ("Noam") was a married U.S. citizen living in Jerusalem.

226.    On the afternoon of December 14, 2015, he was attending classes at Bar-Ilan University.

227.    At approximately 3:00 p.m. he was returning from school to his home on a moped.

228.    As he entered Jerusalem near the Bridge of Strings, he suddenly found that a car had rammed into passengers at a bus stop just ahead of him.

229.    As a result of the attack, the entire area around Noam became engulfed in chaos and he was caught in the midst of victims screaming in agony. He watched as police officers and security personnel came running to the scene with weapons drawn, followed by ambulances and first responders attempting to care for the wounded right before his eyes.

230.    Noam was caught in the throng of panicked bus passengers attempting to flee the area on foot and blocking traffic, running and shouting. Additionally, a fire hydrant that was hit during the attack flooded the street with a strong spray of water adding to the frenzy right before Noam's eyes.

231.    Noam was shocked by the scene in which he suddenly found himself and was extremely frightened that he was in the midst of a terror attack. He saw there were many victims, and became extremely anxious and felt scared for his own safety, fearing a secondary attack, and not knowing what could happen next.

-46-

232.    As Noam left the scene of the attack, he felt petrified and stunned.

233.    Several hours later, Noam began to feel sharp pains in his chest that did not subside and grew increasingly severe. He was transported by ambulance to the hospital and was diagnosed as having a massive heart attack and received emergency cardiac care.

234.    Prior to his encounter with the terrorist car-ramming attack Noam was a healthy 32-year-old with no prior medical history or problems. He was active and loved to play sports. Overnight he became a young man with a serious heart condition. His medical condition continues to persist until today. Noam's life is no longer the same and he must constantly fear that he cannot exert himself and that another heart attack could happened to him. Moreover, his relationship with his wife, Plaintiff Yana Shamba, and his children, H.S., T.M.S., O.S., M.S., N.E.S. and N.S., has changed. Noam is now much more cautious about his activities and is always in the back of his mind he must worry about his health. Neither Noam nor his wife ever believed that he would have medical problems such as this so early in his life.

235.    Noam's doctors attribute his sudden heart attack to the fear he experienced in the terror attack. In addition to the physical disability caused by his heart attack, Noam continues to suffer from mental anguish because of the attack.

236.    Plaintiff Yana Shamba suffered, and continues to suffer, mental anguish and serious psychological and emotional harm as a result of learning of Noam's experiences in the attack, witnessing his subsequent heart attack, and his continuing physical and emotional suffering.

237.    Plaintiffs H.S., T.M.S., O.S., M.S., N.E.S. and N.S. suffered, and continue to suffer, mental anguish and serious psychological and emotional harm as a result of Noam's physical and emotional injuries.

-47-

**I.       The December 23, 2016 Stabbing Attack**

238.     On December 23, 2016, at approximately 6:00pm, Raphael ("Rafi") Lisker, a 50-year-old U.S. citizen and his wife, Shoshana, were walking back to their home in the town of Efrat (located south of Jerusalem and Bethlehem) on Friday evening after attending Sabbath services at a local synagogue.

239.     As the couple strolled, a Palestinian terrorist, Ayman Muhammad Ali Fughara, who had breached the security fence surrounding the community, snuck up behind them on the main avenue, King David Street. The terrorist, who was 25 at the time of the attack, was a resident of the nearby Palestinian village of Jurat a-Shama, He had walked about 40 minutes from his home to arrive in Efrat and carry out an attack.

240.     Seeing the Liskers walking, the terrorist brandished a knife and lunged at Rafi with the weapon. After the initial stabbing Rafi in his neck, the terrorist continued powerfully lacerating him multiple times in the upper body.

241.     Ayman Fughara had sought to kill as many Jewish victims as he could. The terrorist's intent was to stab Rafi in such a way as to initially rupture his lungs completely, thus ensuring that he would be killed near instantly and not put up a struggle. He hoped to then continue with his bloody massacre of as many victims as he could get to until finally being caught or killed himself. There was a group of teenagers that were walking in the area nearby, and the terrorist intended to attack them next after killing Rafi.

242.     Fortunately, however, although badly wounded from the knifing, Rafi mustered the strength to defend himself and ensure that the terrorist would not approach any other civilian. He pushed the attacker away and assumed a boxer's position with his hands in fists. He started yelling

loudly until he scared off the still-armed Ayman Fughara who ran away, escaping beyond the town's borders.

243.    During the stabbing attack, the shocked Shoshana began to scream hysterically and ran to the nearest home on the street in order to bring help, alert the security forces and call for medical assistance.

244.    After fighting off the terrorist, Rafi was badly bleeding and collapsed to the ground.

245.    He had sustained four stab wounds to his spine, the first on the side of the neck followed by the terrorist's three swift and deep plunges to Rafi's upper back.

246.    Rafi was in extreme pain and was bleeding through his clothes. He was very afraid that he would lose consciousness and bleed out on the ground. Security forces and emergency medical responders quickly arrived and evacuated him to Shaarei Tzdek Medical Center in Jerusalem to receive treatment for his stab wounds.

247.    Rafi and Shoshana suffered both severe physical and psychological pain from the brutal stabbing attack. They both understood how close to death they had come and how fortunate they had been.

248.    Long after Rafi's physical injuries began to heal, the couple still were traumatized by the terrorist assault. Over and over again, Rafi and Shoshana replay the scenes of stabbing in their heads. Rafi was unable to sleep properly in the months that followed and when he was able to slumber, he frequently had nightmares. These thoughts and memories leave the couple frightened, depressed and anxious. To this very day, neither Rafi nor Shoshana have ever fully recovered mentally or emotionally, and they continue to suffer mental anguish.

249.    The couple's four children Jonathan Issac Lisker, Avital Kerem Lisker, Tamar Penina Lisker and D.Z.L., who were aged 12-22 years old at the time of the attack, were horrified

to learn about the terrorist stabbing and how their parents were almost murdered. They became very nervous and worried about their father's injuries. They repeatedly felt they had to inquire about his health and safety. In addition, the fact that the terrorist attack had happened so close to their home filled them with fear and anxiety that the attacker could return with his knife. The stabbing was right near their house and they pass by the spot often reminding themselves of it constantly, multiple times a day. At night the children are afraid that a terrorist could enter the residence and harm the family again. They continue to suffer mental anguish as a result of the attack on their parents.

250.    The terrorist, Ayman Fughara was eventually captured by the Israeli security forces two and half years later, in March 2019.  Media reports at the time of the arrest identified the attack as a Hamas operation.

251.    The ISA identified the terrorist as a member of the Hamas terrorist organization.

## J.    The Terrorist Murder of 13 Year Old H.Y.A.

252.    On June 30 2016, 13-year-old H.Y.A., a U.S. citizen, was asleep in her bedroom in the community of Kiryat Arba. H.Y.A. had decided to sleep in late, following a dance performance she had participated in the evening before. The young student had just graduated eighth grade.

253.    At 8:45am, a 17-year-old Palestinian terrorist, Mohammad Nasser Tra'ayra, climbed over the north-side fence of Kiryat Arba. He walked 150 meters through trees and vines that belonged to the Ariel family until he reached their home. The terrorist was a high school dropout who had set out that morning from his village, Banii Naim, with a bag that contained a large knife. His intention was to murder Jews and become a martyr.

254.    At 8:53 a.m., Mohammed Tra'ayra broke into H.Y.A.'s house through a window.

255.     Her parents were not in the home at the time. Finding the house quiet, the intruder searched room by room trying to discover if anyone was in the residence.

256.     When the terrorist discovered the sleeping 13-year-old in her bedroom, he stood over her in her bed, removed his knife and stabbed the child multiple times all over her body.

257.     Members of the volunteer neighborhood security team responded after receiving an alert on their cell phones that the electronic security system on the perimeter of the community had been breached. They entered the Ariels' home looking for a possible intruder.

258.     The team was quickly drawn to H.Y.A.'s bedroom. Upon entering the room, they discovered the grisly scene and the terrorist with his knife. Mohammed Tra'ayra lunged at the civilian guards with his knife and injured one of them. The guard managed to shoot and wound the terrorist.

259.     H.Y.A.'s father, Rabbi Amichai Ariel, was on his way to the house to wake his daughter when he heard of the attack. He entered his home, surveyed the chaos and then fired two shots at the terrorist. One of the shots hit the attacker, the other hit one of the guards who permanently lost sight in one eye as a result.

260.     The terrorist was killed in the house.

261.     Critically wounded, and bleeding from the multiple stab wounds H.Y.A. was transported to Shaare Zedek Medical Center in Jerusalem. Despite emergency efforts to save her life, the 13-year-old died of her stab wounds shortly after.

262.     H.Y.A. was the youngest victim in the wave of brutal terrorist stabbing attacks that were perpetrated in Israel between 2015 and 2016.

263.     The attack on H.Y.A. was carried out by the terrorist following a public call from the Hamas terrorist organization for Palestinians to stab Jews to death.

264.    After the attack Israeli security forces discovered that Mohammad Tra'ayra had posted Hamas materials on his Facebook page and had boasted on his page of his wishes to die as an Islamic martyr. He wrote he wanted to avenge his cousin who rammed a car into an Israeli military vehicle in March 2016, injuring three Israeli soldiers.

265.    In the days after his death, the terrorist's mother praised her son's murder of H.Y.A. and called him a defender of Jerusalem and the al-Aqsa mosque. She called upon other Palestinians to follow in his path.

266.    The terrorist's family is paid a monthly stipend from a Palestinian Authority Martyrs Fund which provides grants to the families of terrorists from Hamas, the Palestinian Islamic Jihad and the PLO.

267.    As a result of the horrific stabbing murder of their 13-year-old daughter and sister, the Ariel family suffered devastating pain and emotional despair. All of the family remains in a state of shock over the cold blooded and brutal killing of a defenseless child in her sleep. Her siblings S.R.A. and K.A. were thrown into a state of depression, fear and loss that does not heal. The talented and lively H.Y.A. was always at the center of this close-knit family.

268.    H.Y.A.'s parents, Plaintiffs Amichai Ariel and Rina Ariel, remain inconsolable and feel a deep sense of anguish and a dark void in their lives that does not dissipate. They have suffered, and continue to suffer, emotional anguish, loss of solatium, and loss of H.Y.A.'s companionship and society. Their suffering today is as grievous and bitter as it was in the days following the murder. H.Y.A.'s image and her memory are constantly with them and accompany every activity they engage in. On holidays, family occasions, her birthday and the anniversary of her murder they feel particularly broken.

-52-

269.    In a social media posting that went viral, on the second anniversary of her daughter's death, Rina Ariel wrote: "On this morning exactly 2 years ago, our H.Y.A. was murdered. Murdered at the hands of an evil one. Just 13.5 years old. An innocent girl who wanted to live, to dance and to dream."

270.    "Since then, the pain has gotten deeper and the loss even more unbearable. And from this depth, I call on each and every individual. Look at your children. At your families. Hug them close. Love and be thankful for what you have. Even when it isn't perfect. Even when it's complicated."

271.    Rina continued: "Let us try to end today with the feeling that we have made progress and advanced even one small thing in this matter. And it will be in memory of H.Y.A."

272.    H.Y.A.'s siblings S.R.A. and K.A. have suffered and continue to suffer emotional anguish, loss of solatium and loss of H.Y.A.'s companionship and society. The Ariel family continues to suffer over their devastating loss until today.

**K.     The Terrorist Murder of Ari Fuld**

273.    On September 16, 2018, Ari Fuld, an American citizen, was stabbed and killed in the Gush Etzion junction in Israel, located adjacent to a community where Israelis, Jews and Americans reside, work, shop and live.

274.    Ari Fuld left his home for a routine shopping trip near the popular Rami Levy supermarket at the Gush Etzion Junction when he was targeted by Khalil Jabarin and stabbed multiple times in the upper back and neck by the terrorist using a 21-centimeter knife. After he was stabbed, he pursued, shot, and wounded the terrorist, who was by that point attempting to also attack a local shop employee. While the shop employee's life was spared, Fuld, who was transported to the hospital, subsequently died from his fatal injuries.

275.    An investigation revealed that the terrorist who stabbed and murdered Ari Fuld was carried out by Hamas terrorist -Khalil Yusef Ali Jabarin. Jabarin was arrested, indicted, and convicted for the murder of Ari Fuld and the attempted murder of three others.

276.    A few hours after the attack, Hamas praised the attack.

277.    Eventually, Hamas, through the official website of Al-Qassam Brigades, took responsibility for the terrorist attack by releasing a video. In the video, the spokesperson for the Al-Qassam Brigades shows pictures of Khalil Jabarin and a video of Jabarin fleeing from the scene of the terrorist attack. The video includes captions proclaiming that HAMAS' jihadist soldiers will continue their presence in the West Bank and will not leave.

## FIRST CLAIM FOR RELIEF
## FOR DAMAGES UNDER 28 U.S.C. §1605A(c)

278.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

279.    Since 1993, the United States has designated Sudan as a state sponsor of terrorism, 58 Fed. Reg. 52523-01 (Oct. 8, 1993).

280.    Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

281.    Hamas and PIJ were both foreign terrorist organizations ("FTOs") at the time they committed, planned, and authorized the terrorist attacks that killed and injured Plaintiffs.

282.    Defendant's services and support provided encouragement to would-be terrorists and incentivized their future attacks.

283.    At the time Defendant provided that substantial assistance to Hamas and PIJ, Defendant knew that: (a) the two FTOs were so designated; (b) the two FTOs and their operatives

engaged in terrorism, including the attacks alleged herein; and (c) the financial assistance that Defendant was providing to those FTOs was essential to their ability to carry out terrorist attacks, including the attacks that injured Plaintiffs.

284.    Defendant also intended that their substantial assistance would facilitate the ability of Hamas and PIJ to carry out their terrorist attacks against Plaintiffs and other civilians. As a result, Defendant recognized that it played an integral role in the FTOs' terrorist activities.

285.    The substantial assistance that Defendant provided to Hamas and PIJ was a substantial factor in causing Plaintiffs' injuries. Moreover, Plaintiffs' injuries were a foreseeable result of that substantial assistance.

286.    As a direct and proximate result of the substantial, knowing assistance that Defendant provided to Hamas and PIJ, Plaintiffs have suffered significant physical, psychological and emotional injuries as alleged *supra*.

287.    As a direct and proximate result of the conduct of the defendants' conduct, plaintiffs suffered the injuries and harm described herein.

288.    The defendants are therefore jointly and severally liable under 28 USC 1605A(c) for the full amount of plaintiffs' damages.

289.    The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF
## FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## PURSUANT TO ISRAELI LAW AND US STATE LAW

290.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

291.    This cause of action arises under the laws of the State of Israel, where the attacks in question took place, under the laws of the District of Columbia, where this action has been filed, and/or under the laws of the state of residence of each named plaintiff.

292.    Defendant's conduct was willful, outrageous and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

293.    Upon learning of the terrorist attacks, Plaintiffs suffered severe emotional distress in worrying about their family members

294.    Defendant intended to, and did in fact, terrorize Plaintiffs, and cause them egregious emotional distress. As a result and by reason of the terrorist attacks, which were caused by the actions of Defendant described herein, Plaintiffs have suffered and will continue to suffer terror, severe mental anguish, bereavement and grief, and injury to their feelings.

295.    Defendant is liable for the full amount of Plaintiffs' damages. *See Campuzano*, 281 F. Supp. 2d at 271, 276-77 (holding the defendants liable under intentional infliction of emotional distress to relatives of other victims who, like Plaintiffs here, were not present at the Terrorist Attack).

296.    The conduct of Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

**THIRD CLAIM FOR RELIEF**
**FOR LOSS OF CONSORTIUM PURSUANT ISRAELI LAW AND US**
**STATE LAW**

297.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

298.    This cause of action arises under the laws of the State of Israel, where the attacks in question took place, under the laws of the District of Columbia, where this action has been filed, and/or under the laws of the state of residence of each named plaintiff.

299.    As a result of the terror attacks described herein, the Plaintiffs named herein who were not directly killed or injured themselves were deprived of the services, society and solatium of their parent, child, sibling, spouse, or other family member, and suffered severe mental anguish, bereavement and grief, and injury to their feelings.

300.    By reason of the foregoing, Plaintiffs are entitled to recover the full extent of their damages.

301.    Defendant's conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large. Plaintiffs are therefore entitled to an award of punitive damages against Defendant in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
## FOR WRONGFUL DEATH

302.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

303.    Defendants, personally and/or through their agents and/or employees and/or co-conspirators, willfully and deliberately authorized, organized, planned, aided, abetted, induced, conspired to commit, provided material support for and executed the terror attacks at issue herein.

304.    Defendants' behavior constituted a breach of legal duties to desist from committing, or aiding, abetting, authorizing, encouraging or conspiring to commit acts of extrajudicial killing and hostage taking, and to refrain from intentionally, wantonly, and/or negligently authorizing or

causing the infliction of death, physical injuries and harm to persons such as the plaintiffs herein and the decedent.

305.    Defendants' actions were willful, malicious, intentional, wrongful, unlawful, negligent and/or reckless and were the proximate cause of the Kidnapping and Murder.

306.    At the time of death of each decedent, such decedent was enjoying good health, was industrious and in possession of all his faculties.

307.    The Kidnapping and Murder of Naftali caused the decedents, their estates and plaintiffs severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

308.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

309.    The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.


**FIFTH CLAIM FOR RELIEF**
**ON BEHALF OF THE ESTATE PLAINTIFFS**
**FOR SURVIVAL DAMAGES**

310.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

311.    The terrorist murder of each of the decedents named herein caused by defendants' actions herein caused such decedent and his estate severe injury, including pain and suffering, pecuniary loss and loss of income.

312.     Prior to his death, decedent suffered great conscious pain, shock and physical and mental anguish.

313.     Defendants are therefore jointly and severally liable to the plaintiff estates for the full amount of decedent's damages, in such sums as may hereinafter be determined.

314.     The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## **JURY DEMAND**

Plaintiffs demand trial by jury of all issues legally triable to a jury.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a)     Judgment against Defendant for compensatory damages in an amount to be determined at trial;

(b)     Judgment against Defendant, for punitive damages in an amount to be determined at trial;

(c)     Plaintiffs' costs and expenses;

(d)     Plaintiffs' attorneys fees;

(e)     Pre-judgment and post-judgment interest; and

(f)     Such other and further relief as the Court finds just and equitable.

Dated: December 14, 2020
Brooklyn, New York

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Counsel for Plaintiffs*

By:

Robert J. Tolchin
(D.C. Bar #NY0088)

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
rtolchin@berkmanlaw.com

NITSANA DARSHAN-LEITNER & CO.
Nitsana Darshan-Leitner*
*(International Counsel for Plaintiffs)*
11 Havatikim Street
Petah Tikva, 49389
Israel
+972 523513953
nitsanaleitner@gmail.com

_____
* Member of the Israeli Bar